# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Petitioner,

v.

THE SUPERIOR COURT OF SAN DIEGO COUNTY,
Respondent;

BRYAN MAURICE JONES,
Real Party in Interest.

S255826

Fourth Appellate District, Division One
D074028

San Diego County Superior Court
CR136371

December 2, 2021

Justice Kruger authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Corrigan, Liu,
Groban, and Jenkins concurred.

PEOPLE v. SUPERIOR COURT (JONES)

S255826


Opinion of the Court by Kruger, J.


A jury convicted Bryan Maurice Jones of capital murder and returned a verdict of death in 1994. Decades later, after this court affirmed his conviction and death sentence on appeal, Jones filed a habeas corpus petition claiming the prosecution had used peremptory strikes to discriminate against prospective jurors in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). In connection with this petition, Jones filed a motion for postconviction discovery under Penal Code section 1054.9 seeking access to the prosecutor's jury selection notes. The trial court granted the motion, rejecting the District Attorney's argument that the notes are shielded from disclosure as attorney work product. The Court of Appeal affirmed.

We affirm as well. At the *Batson/Wheeler* hearing, the prosecutor had relied on an undisclosed juror rating system to explain his reasons for the challenged peremptory strikes. By putting the rating system at issue, the prosecutor impliedly waived any claim of work product protection over notes containing information about the system. The District Attorney may not now invoke attorney work product protection to withhold information necessary to the fair adjudication of Jones's *Batson/Wheeler* claim.

## I.

During jury selection at Jones's 1994 trial, defense counsel raised multiple objections to the prosecution's use of peremptory strikes to eliminate Black jurors from the jury pool. On each occasion, counsel argued the strikes were motivated by race and therefore invalid under *Batson* and *Wheeler*.

Jones initially challenged the prosecutor's strikes of prospective jurors Y.J. and C.G. To evaluate Jones's claim, the trial court employed the familiar three-step framework set out in *Batson*. (See, e.g., *People v. Williams* (2013) 58 Cal.4th 197, 280.) At the first step of the inquiry, the trial court determined that Jones made a prima facie showing of racial discrimination and proceeded to the second step of the inquiry by asking the prosecutor to provide his reasoning for the strikes. The prosecutor explained that he used a numerical rating system to evaluate prospective jurors sight unseen based on answers in their written juror questionnaires; he told the court that both he and another member of the prosecution team had assigned Y.J. and C.G. low scores using this system. The prosecutor offered that Prospective Juror Y.J., for instance, was rated "13th lowest of the whole group," and "[t]here were too many people that are [rated] better than her." The prosecutor went on to elaborate on the ratings of Y.J. and C.G. by describing their written answers to specific questions on the questionnaires. At the third and final step of the inquiry, the trial court accepted the prosecutor's explanations for the two strikes as race neutral and denied Jones's *Batson/Wheeler* challenge.

Jones renewed the challenge when the prosecutor struck another Black prospective juror, J.Y. After the trial court found a prima facie showing of discrimination, the prosecutor similarly

cited the prospective juror's low score, explaining that it was "based upon our numerical analysis by three people who independently read the questionnaire." The trial court again accepted the prosecutor's explanations and denied the challenge.

The seated jury ultimately found Jones guilty and returned a verdict of death. On direct appeal of the judgment, Jones claimed that the prosecution's peremptory strikes of Y.J. and C.G. were improper and that the prosecutor's proffered race neutral justifications were pretexts for discrimination. (See *People v. Jones* (2013) 57 Cal.4th 899, 916.) We rejected the argument, concluding "our usual deference to the trial court's assessment of the prosecutor's sincerity [was] appropriate" on the facts presented.[1] (*Id.* at p. 918.) Finding no other reversible error, we affirmed Jones's conviction and sentence. (*Id.* at p. 981.)

In 2014, the year after we decided Jones's direct appeal, and 20 years after the trial, Jones filed a petition for writ of habeas corpus in this court. He substantively amended the petition in 2018. Among other claims, the amended petition alleged that Jones's trial counsel was ineffective for failing to raise and properly litigate *Batson/Wheeler* challenges.

---

[1] On direct appeal, Jones also renewed his challenge to the removal of Prospective Juror N.S. (See *People v. Jones, supra,* 57 Cal.4th at p. 916.) With respect to N.S., the trial court had ruled there was no prima facie showing of discrimination. Because it was unclear whether the trial court had applied the correct prima facie case standard, we independently reviewed the record and upheld the trial court's conclusion that Jones failed to make out a prima facie case of discrimination concerning N.S. (*Id.* at pp. 919–920.)

Specifically, the petition asserted that trial counsel was deficient for failing to raise a *Batson/Wheeler* objection when the prosecutor used 13 of 17 peremptory challenges to strike women (see, e.g., *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 146 [holding that gender is an impermissible basis for the exercise of peremptory strikes]; *People v. Howard* (1992) 1 Cal.4th 1132, 1158 [same]), and for inadequately litigating *Batson/Wheeler* challenges to the removal of Black prospective jurors. The amended petition also renewed the *Batson/Wheeler* claims raised on appeal, citing additional evidence not in the trial record.

In connection with his habeas petition, Jones filed a motion for postconviction discovery in superior court under Penal Code section 1054.9 (section 1054.9). The motion requested production of contemporaneous jury selection notes created by the prosecutor and other members of the prosecution team as they prepared for and conducted jury selection in Jones's trial.[2] The District Attorney opposed the motion, asserting the jury selection notes were core work product absolutely protected by Code of Civil Procedure section 2018.030, subdivision (a), and consequently were not discoverable. (See Pen. Code, § 1054.6 ["Neither the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure . . . ."].) In reply, Jones argued that the prosecutor "effectively

---

[2]     Jones also requested other items related to jury selection, including prosecution policies and training materials and records related to other cases tried by the prosecutor. The questions on which we granted review concern only the jury selection notes.

4

waived" any work product privilege over the notes when he offered reasons for the challenged strikes that were based on notes of a juror rating system. Jones further argued the notes were subject to disclosure under Evidence Code section 771, which requires the production of any writing used to refresh the memory of a testifying witness, and that trial counsel would have been entitled to the jury selection notes if counsel had requested them during the *Batson/Wheeler* hearing.

The trial court rejected the District Attorney's work product argument and granted Jones's motion. Voicing general agreement with Jones's arguments, the court determined that Jones was entitled to any notes "that could possibly impeach" the prosecutor's comments during the *Batson/Wheeler* hearings. The court observed that without such material, Jones would be unable to address the legitimacy of the prosecutor's reasons for striking prospective jurors.

The District Attorney petitioned for a writ of mandate and/or prohibition seeking to vacate the trial court's order. The Court of Appeal summarily denied the petition. We granted the District Attorney's petition for review and transferred the matter to the Court of Appeal with instructions to issue an order to show cause.

In a published opinion, the Court of Appeal upheld the trial court's order. (*People v. Superior Court* (*Jones*) (2019) 34 Cal.App.5th 75 (*Jones*).) The Court of Appeal began by questioning "whether the work product privilege remains absolute when a court has an obligation to evaluate the intent of the prosecution, and the written mental impressions themselves may reveal an effort to unlawfully exclude prospective jurors based on race or gender." (*Id.* at p. 81.) The

court opined that to extend absolute work product protection to such writings, as opposed to writings reflecting the attorney's thoughts and opinions about the legal case or trial strategy, would be inconsistent with the nature of an inquiry that requires trial courts to evaluate the prosecutor's reasons for exercising challenged strikes. (*Id.* at p. 82.) But even assuming jury selection notes are otherwise nondiscoverable work product, the court went on to hold that the prosecution had waived work product protection. (*Id.* at p. 83.) Citing both Evidence Code section 771 and *United States v. Nobles* (1975) 422 U.S. 225, 239 (*Nobles*), the court reasoned that because the prosecutor had used his notes to refresh his recollection about the reasons for striking the challenged jurors and because he described the numerical evaluations detailed in those notes, the opposing party was entitled to see the notes upon request. (*Jones*, at pp. 83–85.)

We granted the District Attorney's petition for review to consider whether the trial court's disclosure order was permissible. In addressing this issue, the Court of Appeal applied an abuse of discretion standard, which is the usual standard for reviewing discovery rulings. (*Jones*, *supra*, 34 Cal.App.5th at p. 79.) But the particular discovery ruling at issue in this case encompasses various determinations — including whether, as Jones has argued, the prosecution waived any applicable work product through its litigation conduct — that arguably call for a more demanding standard of review. Several courts have treated claims regarding the waiver of work product protections and other privileges as mixed questions of law and fact subject to independent review on appeal. (See, e.g., *Behunin v. Superior Court* (2017) 9 Cal.App.5th 833, 842–843; *McKesson HBOC, Inc. v. Superior Court* (2004) 115 Cal.App.4th

1229, 1235–1236; *U.S. v. Sanmina Corp.* (9th Cir. 2020) 968 F.3d 1107, 1116; *U.S. v. Lara* (4th Cir. 2017) 850 F.3d 686, 690.) But not all courts are in accord. (See, e.g., *In re Chevron Corp.* (3d Cir. 2011) 633 F.3d 153, 161 [applying an abuse of discretion standard]; *In re Grand Jury Proceedings* (2d Cir. 2000) 219 F.3d 175, 182 [same].) We do not resolve the issue here, since neither party has briefed it and the answer is immaterial in any event. Whether we were to apply independent review or a more deferential standard, we would conclude the trial court properly ordered disclosure of the requested materials in order to ensure fair adjudication of Jones's *Batson/Wheeler* claims.

## II.

More than four decades ago, this court in *Wheeler* held that the use of peremptory challenges to remove prospective jurors on the basis of race or other forms of group bias violates article I, section 16 of the California Constitution. (*Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.) Several years later, the United States Supreme Court in *Batson* reached the same conclusion under the equal protection clause of the Fourteenth Amendment to the United States Constitution. (*Batson*, *supra*, 476 U.S. at p. 86.) As a result of these decisions, a litigant has the right to challenge an opponent's discriminatory use of peremptory challenges. But as both the United States Supreme Court and this court have repeatedly made clear, the harm of the practice is not limited to individual litigants. Discrimination in jury selection also does grievous injury to the jurors and to "the very integrity of the courts" charged with ensuring equal justice for all comers in a diverse society. (*Miller-El v. Dretke* (2005) 545 U.S. 231, 238 (*Miller-El*); accord, *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1154.)

Courts employ a three-step inquiry to uncover unconstitutional discrimination in the exercise of peremptory strikes. Once a defendant has made out a prima facie case of discrimination, the burden shifts to the prosecution to provide a neutral justification for the strike; the trial court must then decide whether purposeful discrimination has occurred. (*Johnson v. California* (2005) 545 U.S. 162, 168; *People v. Williams*, *supra*, 58 Cal.4th at p. 280.)

Although this burden-shifting framework is well established, experience has demonstrated "the practical difficulty of ferreting out discrimination in selections discretionary by nature, and choices subject to myriad legitimate influences." (*Miller-El, supra*, 545 U.S. at p. 238.) Assessing an attorney's motivation for striking a juror, as required at *Batson*'s third step, is often a sensitive and challenging inquiry.[3] The trial court must discern the motives of the striking attorney by "assess[ing] the plausibility of [the attorney's proffered] reason in light of all evidence with a bearing on it." (*Id.* at p. 252.) Considering "all evidence with a bearing" on the attorney's motives typically requires the trial court to evaluate factors such as the attorney's demeanor, the plausibility of his or her explanations, as well as the court's own observations, if any, about the struck juror as compared with the other jurors in the venire. (*Ibid.*; see also *People v. Lenix* (2008) 44 Cal.4th 602, 613.) A trial judge may also further question the

---

[3]    As the trial judge remarked in this case: "I will tell you, as a long time trial judge, this is a very difficult issue for trial judges to deal with because you have an attorney at sidebar and he or she is making representations to you as to why a peremptory challenge was made, and it's always been, for this Court, a very uncomfortable sidebar."

attorney on any particular proffered rationale for a challenged strike and may rely on the judge's own experiences both as an attorney and on the bench. " 'Usually, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible." ' " (*People v. Smith* (2018) 4 Cal.5th 1134, 1147, quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 339.)

While a trial court's determination at *Batson*/*Wheeler*'s third step is ordinarily made on the basis of oral representations and personal observation, appellate and postconviction review is often confined to the written record. Although not limited to the precise arguments or evidence presented to the trial court on the challenged peremptory strikes (see, e.g., *People v. Lenix, supra*, 44 Cal.4th at p. 622), reviewing courts are generally constrained to "rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination" (*Wheeler, supra*, 22 Cal.3d at p. 282). In some cases, limitations in the trial record may make it difficult for a reviewing court to fully evaluate a claim of *Batson*/*Wheeler* error.

Attorneys and courts have, on various occasions, relied on jury selection notes to provide additional evidentiary support for *Batson*/*Wheeler* claims raised on appeal or in postconviction proceedings. Recent decisions of the United States Supreme Court offer important examples. In *Miller-El, supra*, 545 U.S. 231, for instance, the court granted federal habeas relief to a prisoner who alleged that prosecutors impermissibly struck Black veniremembers on the basis of race at his trial many years earlier. In reaching that conclusion, the high court cited considerable evidence bearing on the issue of discrimination,

including the prosecutor's notations on jury cards indicating the race of each veniremember. The high court observed that "the prosecutors' own notes proclaim that [an] emphasis on race was on their minds when they considered every potential juror." (*Id.* at p. 266.)

In granting the discovery order in this case, the trial court pointed specifically to *Foster v. Chatman* (2016) 578 U.S. 488 [136 S.Ct. 1737] (*Foster*), in which the prosecution's jury selection notes formed the centerpiece of the petitioner's claim on habeas. The prosecution's jury selection file, which petitioner had obtained through a public records request, unambiguously revealed the role race played in the prosecution's decisionmaking process. The prosecutor had used a highlighter to identify all of the Black prospective jurors, with the legend stating that the highlighting " 'represents Blacks.' " (*Id.* at p. 1744.) Additionally, the letter B appeared next to each Black prospective juror's name. On the questionnaires of Black jurors, the "juror's response indicating his or her race had been circled." (*Ibid.*) There were also handwritten notes indicating the prosecution's aversion to seating Black jurors, an investigator's draft affidavit explaining who to select " '[i]f it comes down to having to pick one of the black jurors,' " and notes that put an N (allegedly for no) next to every prospective Black juror's name. (*Ibid.*)

Rejecting the state's entreaties to ignore the jury selection file, the high court concluded that the file was not only relevant, but dispositive; the prosecutor's notes revealed a singular focus on the jurors' race that "plainly demonstrate[d] a concerted effort to keep black prospective jurors off the jury." (*Foster*, *supra*, 136 S.Ct. at p. 1755; see *ibid.* ["The contents of the

prosecution's file . . . plainly belie the State's claim that it exercised its strikes in a 'color-blind' manner."].)

These cases offer particularly prominent examples of how jury notes can shed light on an attorney's contemporaneous motives in striking a prospective juror, but they are not isolated ones. In *Mitcham v. Davis* (N.D.Cal. 2015) 103 F.Supp.3d 1091, for instance, the federal court reviewed the prosecutor's jury selection notes before granting habeas relief to a California prisoner on *Batson*-related grounds. The notes revealed that the prosecutor had kept track of the race of the Black jurors but not of other jurors and had rated every Black juror as unacceptable. The prosecutor's notes during the voir dire of one Black juror stated: " 'Keep if necessary to avoid *Wheeler* — She would try to be fair.' " (*Id.* at p. 1097.) The notes also revealed evidence of racial bias in the striking of certain White jurors with Black relatives; next to one White juror, he wrote: " 'Think her husband is black.' " (*Ibid.*)

Jones directs us to other cases in which courts in this state and elsewhere have found probative evidence in jury selection notes.[4] Many — though not all — of these cases involve similar claims of racial bias bolstered by jury selection notes. In one case, initially tried in 2002 in North Carolina and overturned on collateral review in 2020, newly disclosed jury selection notes revealed that prosecutors had described Black veniremembers in starkly derogatory terms compared with similarly situated White veniremembers. For example, a prospective Black juror with a criminal record was labeled a "thug[]" while a White venireman who prosecutors noted had an "ext[ensive] [criminal]

---

[4]     We granted Jones's request to take judicial notice of several unpublished opinions and pleadings as relevant to this appeal.

record" was described as a "n[e'er] do well." Similarly, prosecution notes described a prospective Black juror as a "blk. Wino — drugs," but a White veniremember with a drinking problem as "drinks — country boy — OK."

In another case, a Georgia court concluded that jury selection notes contributed to the "undeniable" evidence of discrimination. (*State v. Gates* (Ga.Super.Ct., Jan. 10, 2019, No. SU-75-CR38335) 2019 Ga.Super. LEXIS 420, p. *4 [Order on Defendant's Extraordinary Motion for New Trial].)[5] In 1977, Johnny Lee Gates, a Black man, was convicted of murder by an all-White jury following a three-day trial and sentenced to death. Jury selection notes revealed that the prosecutor indicated the race and sex of each prospective juror in his notes, using the letter W for White prospective jurors and the letter N to indicate that prospective jurors were Black. The prosecutor described the Black jurors in derogatory terms and gave every Black juror the prosecution's lowest juror rating, while giving the lowest rating to only one of the 43 prospective White jurors.

In each of these cases, the jury selection notes proved important in litigating a claim of discrimination many years after the fact. But as is true of any other type of evidence, jury selection notes may be relevant to the inquiry even when they do not contain a smoking gun. Nor are jury selection notes necessarily relevant only to prove improper motivation; they

_____

[5] Because Gates's trial occurred before *Batson*, the trial court applied the standard set forth in *Swain v. Alabama* (1965) 380 U.S. 202, and therefore considered evidence of systemic discrimination, including evidence of jury selection notes for trials other than Gates's. Although the court found Gates had demonstrated discrimination in jury selection, the court ultimately rejected Gates's claim for procedural reasons.

may also counter claims of racial bias. For example, in *In re Freeman* (2006) 38 Cal.4th 630, the petitioner claimed the prosecutor had struck prospective jurors he believed were Jewish. We concluded that the petitioner did not meet his burden to show improperly motivated strikes in part because the prosecutor's notes revealed detailed observations about individual veniremembers' characteristics but made neither explicit nor implicit reference to the religion of prospective jurors he ultimately excused. (*Id.* at pp. 642–644.)[6]

The District Attorney in this case agrees that when jury selection notes are available, they often prove relevant, and sometimes dispositive, particularly in adjudicating *Batson/Wheeler* claims on postconviction review. But as the District Attorney correctly notes, neither *Foster* nor any other case binding on this court answers the question when, precisely, jury selection notes must be made available for purposes of the *Batson/Wheeler* inquiry.[7] We now turn to that question as it is presented in this case.

---

[6] We note that recording prospective jurors' race, gender, or other characteristics may be benign and may also assist in the evaluation of *Batson*/*Wheeler* motions by making a complete record of the composition of the venire and the seated jury.

[7] As explained above, the petitioner in *Foster* obtained jury selection notes through a public records request. This case raises no question about the availability of the notes under California's Public Records Act (Gov. Code, § 6250 et seq.).

## III.

The question here arises from a request for postconviction discovery under section 1054.9.[8]  Section 1054.9 authorizes postconviction discovery in certain felony cases but identifies the scope of discoverable materials as those "materials in the possession of the prosecution and law enforcement authorities to which the same defendant would have been entitled at time of trial."  (*Id.*, subd. (c); see *id.*, subd. (a); *In re Steele* (2004) 32 Cal.4th 682, 690 (*Steele*).)  The District Attorney contends that Jones is not entitled to jury selection notes because Penal Code section 1054.6 specifies that, under the statutory discovery rules, "[n]either the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure."  The District Attorney argues the notes constitute protected work product as defined in Code of Civil Procedure section 2018.030, subdivision (a) and the court therefore may not order their disclosure.[9]

---

[8]  We are concerned in particular with postconviction discovery sought before an order to show cause issues.  We express no view regarding the available scope of discovery after issuance of an order to show cause.  (See *In re Scott* (2003) 29 Cal.4th 783, 813 [after order to show cause issues, the "scope of discovery in habeas corpus proceedings has generally been resolved on a case-by-case basis" and referees may fashion fair discovery rules to govern the proceedings]; see *id.* at p. 814.)

[9]  The District Attorney alternatively suggests that the jury selection notes are not subject to postconviction discovery orders because they are not included in the list of mandatory pretrial discovery materials that Penal Code section 1054.1 requires the prosecution to provide even absent a disclosure request.  But as

The work product doctrine now codified in Code of Civil Procedure section 2018.030 was initially developed by courts. In an influential statement of the doctrine, the United States Supreme Court described the rationale as follows: "[I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." (*Hickman v. Taylor* (1947) 329 U.S. 495, 510–511; see *Coito v. Superior Court* (2012) 54 Cal.4th 480, 489–494 (*Coito*) [recounting the history of work product doctrine].) When the Legislature later codified the doctrine, it assigned attorney work product either absolute or qualified protection, depending on the type of material at issue. "Absolute protection is afforded to writings

---

we explained in *Steele*, postconviction discovery under section 1054.9 is not limited to materials the prosecution had "a statutory duty to provide" at the time of trial; postconviction discovery also extends to, among other things, materials "to which the defendant would have been entitled at time of trial had the defendant specifically requested them." (*Steele, supra,* 32 Cal.4th at pp. 695, 697.) The criminal discovery statutes expressly recognize that the availability of discovery may be governed by "other express statutory provisions" and constitutional mandates. (Pen. Code, § 1054, subd. (e).) In short, the fact that jury selection notes are not included in Penal Code section 1054.1 as items of mandatory pretrial discovery, along with witness lists and defendant statements, does not mean that the jury selection notes are not discoverable under section 1054.9. The District Attorney raises no other argument that the governing statutes preclude the disclosure of the notes, and we do not consider any statutory arguments that have not been raised.

that reflect 'an attorney's impressions, conclusions, opinions, or legal research or theories.' ([Code Civ. Proc.,] § 2018.030, subd. (a).) All other work product receives qualified protection; such material 'is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice.' (§ 2018.030, subd. (b).)" (*Coito*, at p. 485.)

The District Attorney asserts that jury selection notes are writings entitled to absolute protection under Code of Civil Procedure section 2018.030, subdivision (a) because they reveal an attorney's opinions and impressions of potential jurors. Jones, for his part, argues that the work product doctrine does not reach opinions and impressions of jurors, as opposed to opinions and impressions of the legal case. He characterizes the District Attorney's opposing view as overly broad and unmoored from the doctrine's central purposes — namely, to allow attorneys to prepare their cases for trial and to prevent their opponents from free-riding on their efforts. (See Code Civ. Proc., § 2018.020.)

We need not resolve this broad dispute about the reach of work product protection to answer the question before us, which concerns one party's invocation of the work product doctrine to shield matters it had put in issue during the litigation of the *Batson/Wheeler* challenge. Even if we assume that jury selection notes are protected work product as defined by Code of Civil Procedure section 2018.030, subdivision (a), we nonetheless agree with the courts below that the prosecutor in this case impliedly waived any work product protection when he justified his peremptory challenges by putting in issue information the District Attorney now seeks to withhold as confidential in postconviction discovery.

16

Although the work product statute does not directly address the issue of waiver, it is well established that work product protection, like other forms of privilege, can be waived through conduct. (See *Ardon v. City of Los Angeles* (2016) 62 Cal.4th 1176, 1186 (*Ardon*); *Rico v. Mitsubishi Motors Corp.* (2007) 42 Cal.4th 807; *BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1254.) Waiver may be found where the privilege holder, without coercion, discloses a significant part of the communication to another person. (*Labor & Workforce Development Agency v. Superior Court* (2018) 19 Cal.App.5th 12, 35–36; cf. Evid. Code, § 912, subd. (a) [setting out the same waiver standard for enumerated forms of privilege, not including work product protection].) An implied waiver may also be found when a party "has put the otherwise privileged communication directly at issue and . . . disclosure is essential for a fair adjudication of the action." (*Southern Cal. Gas Co. v. Public Utilities Com.* (1990) 50 Cal.3d 31, 40, citing *Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 609 (*Mitchell*).)

Much like the work product doctrine itself, this second theory of implied waiver is premised on the need to protect the integrity of the judicial proceeding. The cases recognize that allowing one party to rely on a document to establish key facts while simultaneously shielding that same document from the other side works an unfair adversarial advantage. Considerations of basic fairness accordingly "may require disclosure of otherwise privileged information or communications where [a party] has placed in issue a

communication which goes to the heart of the claim in controversy." (*Mitchell, supra*, 37 Cal.3d at p. 604.)[10]

Courts have found implied waiver in a variety of litigation contexts. In *Nobles*, for example, the United States Supreme Court rejected an argument that criminal defense counsel could simultaneously rely on a testifying defense investigator to impeach the credibility of a critical prosecution witness while also claiming the investigator's report was protected by the work product doctrine. The court explained: "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. . . . [¶] . . . Respondent, by electing to present the investigator as a witness, waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination." (*Nobles, supra*, 422 U.S. at pp. 238–240, fn. omitted.)[11]

---

[10]    The Legislature has similarly determined that tendering a particular issue in a proceeding waives certain privileges. (See, e.g., Evid. Code, §§ 958, 996, 1016.)

[11]    The *Nobles* court explained that waiver "normally" does not extend to counsel's use during trial of "notes, documents, and other internal materials prepared to present adequately his client's case." (*Nobles, supra*, 422 U.S. at p. 239, fn. 14.) We likewise affirm that "[w]hat constitutes a waiver with respect to

*Wellpoint Health Networks, Inc. v. Superior Court* (1997) 59 Cal.App.4th 110 is also instructive. The plaintiff in *Wellpoint* brought an employment discrimination action in which the employer raised an affirmative defense based on corrective action it had taken in response to an internal investigation. The plaintiff sought production of the investigative reports. Overruling the employer's claims of privilege, the Court of Appeal concluded the plaintiff was entitled to the reports. It reasoned that the "adequacy or thoroughness of a defendant's investigation of plaintiff's claim," while typically "irrelevant" to most civil actions, is highly relevant "*if* the employer chooses to defend by establishing that it took reasonable corrective or remedial action." (*Id.* at p. 126, italics added.) By raising this defense, the employer had "inject[ed] into the lawsuit . . . an issue concerning the adequacy of the investigation," resulting in waiver of the work-product doctrine. (*Id.* at p. 128.) "If a defendant employer hopes to prevail by showing that it investigated an employee's complaint and took action appropriate to the findings of the investigation, then it will have put the adequacy of the investigation directly at issue, and cannot stand on the attorney-client privilege or work product doctrine to preclude a thorough examination of its adequacy. The defendant cannot have it both ways. If it chooses this course, it does so with the understanding that the attorney-client privilege and the work product doctrine are thereby waived." (*Ibid.*)

---

work-product materials depends, of course, upon the circumstances" (*ibid*.) and do not suggest that an attorney's ordinary reliance on notes throughout trial would necessarily waive work product protections.

The Court of Appeal in this case, citing *Nobles* and *Wellpoint*, adopted similar reasoning to find implied waiver. It then went on to liken the prosecutor to a witness who testified after refreshing his recollection with his notes, citing Evidence Code section 771. (*Jones*, *supra*, 34 Cal.App.5th at pp. 83–84.) We agree with the District Attorney that section 771 has no direct application here, since an attorney in a *Batson*/*Wheeler* hearing does not testify as a sworn witness. But the analogy nonetheless serves. The law requires disclosure of notes used to refresh a witness's recollection for much the same reason courts imply waiver in other contexts: to ensure the basic fairness of the proceedings where a party has put the substance of privileged material in issue. (See, e.g., *Kerns Constr. Co. v. Superior Court* (1968) 266 Cal.App.2d 405, 411 [an attorney may not provide a witness with protected documents, "allow a witness to testify therefrom and then claim work product privilege to prevent the opposing party from viewing the document from which he testified"].)

Here, the prosecutor invoked an undisclosed juror rating system in justifying his use of peremptory challenges at the second step of the *Batson / Wheeler* inquiry. Had the prosecutor instead relied solely on a straightforward listing of juror characteristics, the prosecutor's reasons could have been questioned by the defense and judged against the trial court's own observations. But the defense and trial court had no way of confirming or evaluating the prosecutor's claims that he used a race-neutral rating system they had never seen. Unlike an attorney who simply glances at her or his notes to recall a particular answer provided during voir dire, for example, a striking attorney who makes this sort of "testimonial use" of undisclosed writings gains an unfair adversarial advantage by

doing so. (*Nobles*, *supra*, 422 U.S. at p. 239, fn. 14.) Effectively the striking attorney has placed in issue information that goes to the heart of the question before the court, whether there has been discrimination in jury selection. Under our cases, that choice is one that constitutes waiver of any claim that the information may be withheld as protected work product.

The District Attorney protests that there could have been no effective waiver because any disclosure or invocation of protected information was coerced. (See *Regents of University of California v. Superior Court* (2008) 165 Cal.App.4th 672, 679.) The District Attorney stresses that an attorney provides a justification for striking the challenged prospective jurors only at the request of the court — a request compelled by *Batson*, and therefore one that the attorney is hardly free to refuse. All of this is true, but it hardly follows that a striking attorney must explain the challenged strikes by invoking an otherwise confidential rating system she or he believes to be protected work product.

Here, when the trial court asked the prosecutor to defend the challenged strikes, the prosecutor did not simply cite concerns about the prospective jurors' occupations, volunteer activities, or other characteristics established through voir dire. Instead, the prosecutor pointed to the documented results of a purportedly color-blind numerical rating system devised by the prosecution and offered detailed explanations regarding the low scores multiple prosecution team members had given each of the struck jurors.[12] Considering this record of the *Batson*/*Wheeler*

_____

[12] The District Attorney suggests in reply that any waiver was "inadvertent," bringing the notes within the exception for

hearings at trial and the waiver principles we have discussed, we conclude that the District Attorney's assertion of work product protection is not a basis for overturning the postconviction trial court's disclosure order.  The point, in the end, is simple:  A striking attorney cannot both stand on such a rating system and assert privilege over it.[13]

## IV.

For these reasons, we reject the District Attorney's argument that work product protection categorically bars disclosure of jury selection notes in postconviction discovery. Here there has been an implied waiver of any claim to work product protections and so the jury selection notes are subject to disclosure.  This is true for notes revealing a clear focus on impermissible discrimination, such as the notes in *Foster*, as well as those that might not, on their own, reveal a discriminatory purpose but that would tend to support the *Batson*/*Wheeler* challenge when aggregated with other evidence or notes.

We recognize, however, that disclosure of jury notes, like disclosure of any other attorney writing, can risk unnecessary incursion on the confidentiality of attorney work product beyond the scope of the matter now at issue.  Though the notes may illuminate an attorney's opinions and impressions of prospective

---

inadvertent disclosure recognized by *Ardon*, *supra*, 62 Cal.4th 1176.  The analogy is inapt; in that case, as in other inadvertent disclosure cases, the disclosures at issue were accidental.  That is not the case here, where the prosecutor made a calculated decision to provide explanations of his rating system.

[13]    We express no view on whether, under different circumstances, there would be a waiver of any work product protection attaching to jury selection notes.

jurors — the matter specifically at issue in a *Batson/Wheeler* claim — they may also reveal opinions and impressions of the case and legal strategy.

To the extent the District Attorney raises concerns about overbroad discovery in this context, the law offers answers. Attorneys resisting what they view as overbroad discovery efforts may "make a preliminary or foundational showing that disclosure would reveal . . . 'impressions, conclusions, opinions, or legal research or theories[]' (§ 2018.030, subd. (a)[])" unrelated to jury selection, and "[u]pon an adequate showing, the trial court should then determine, by making an in camera inspection if necessary, whether absolute work product protection applies to some or all of the material." (*Coito*, *supra*, 54 Cal.4th at pp. 495–496.) In this way, the trial court may ensure on a "case by case" basis (*id*. at p. 495) that necessary redactions are made to protect core work product that is not relevant to the *Batson/Wheeler* challenge at issue.

## DISPOSITION

The judgment of the Court of Appeal is affirmed, and the case remanded for further proceedings not inconsistent with this opinion.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Superior Court (Jones)

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 34 Cal.App.5th 75
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S255826
**Date Filed:**  December 2, 2021

_____

**Court:**  Superior
**County:** San Diego
**Judge:** Joan P. Weber


_____

**Counsel:**

Summer Stephan, District Attorney, Mark A. Amador, Linh Lam, Samantha Begovich and Anne Spitzberg, Deputy District Attorneys, for Petitioner.

Jeff Rubin, Deputy District Attorney (Santa Clara), for California District Attorneys Association as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Shelley J. Sandusky, Cliona Plunkett and Rachel G. Schaefer for Real Party in Interest.

Michael C. McMahon for California Public Defenders Association and Todd W. Howeth as Amici Curiae on behalf of Real Party in Interest.

Wesley A. Van Winkle for Private Practice Capital Habeas Corpus Attorneys as Amici Curiae on behalf of Real Party in Interest.

Kristen A. Johnson, Natasha C. Merle, Liliana Zaragoza and Mahogane C. Reed for NAACP Legal Defense & Educational Fund, Inc., as Amicus Curiae on behalf of Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Anne Spitzberg
Deputy District Attorney
300 West Broadway, Suite 860
San Diego, CA 92101
(619) 531-3591

Rachel G. Schaefer
Habeas Corpus Resource Center
303 Second Street, Suite 400 South
San Francisco, CA 94107
(415) 348-3800

Natasha Merle
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200